Please be seated. Thank you. Please call the next case. 213, 9-12, Roto Lincoln Mercury, Inc. v. Beverly Works Company. Counsel may proceed. Good morning, Honorable Justices. May it please the Court, my name is Ben Schroeder. I'm the Plaintiff Appellant for representing Roto Lincoln Mercury. We ask this Court find that the Commission's decision was against the manifest weight of the evidence. As I'm sure you're quite aware, this whole appeal process is in regards to whether Petitioner's current condition to his right shoulder is related to his accident of July 3, 2008. I'm going to take a few quick seconds here before I get to the meat of my argument to inform you that Petitioner did have pre-existing conditions of prior issues with his right shoulder before the accident of July 3, 2008. We know of, based on the medical records that we received, we know of him receiving care in January of 2004 and July of 2004 for his right shoulder. At that time, he had a locked right shoulder and he also was unnoted with tendinitis in the right shoulder. In 2005, he also went to see a doctor and he was also diagnosed with rotator cuff tendinitis and subacromial bursitis. Now, again, I say these are the medical records that we know of. I point that out because during the testimony at trial, he claimed that he did not have any prior issues with his shoulder. He also testified to that during the IME, or he stated that during the IME with Dr. Verma. Now, obviously, these medical records show different. I want to talk about the IME. One of the issues with the commission decision was, excuse me, not the IME, the MRI, the 2008 MRI versus the 2010 MRI. I'm sure you're well aware of the 2008 MRI. The radiologist found that there was an increase in the signal with the supraspinatus tendon. He diagnosed saying that this was consistent with a tear. Dr. Verma looked at this. He said that it wasn't. He didn't see that there was a tear. He stated that the rotator cuff was fine and that there wasn't a tear. Initially, Dr. Cohen, petitioner's treating physician, stated that petitioner did have a rotator cuff tendinitis and a tear. But the problem is Dr. Cohen's actions speak louder than his words. We need to look at the medical record from September 19, 2008. At that time, Dr. Cohen recommended petitioner undergoing an arthroscopic evaluation, keyword evaluation. If he knew that there was a tear there, why did he want to do an evaluation? Most of the time, evaluations are performed when you're trying to figure out if there's shoulder stability or what is going on in the shoulder. He wanted to do an evaluation of the shoulder. Another medical record that supports him questioning whether there was a tear to the rotator cuff was November 5, 2008. Interestingly, November 5, 2008, Dr. Cohen states that he thinks petitioner's symptoms are from cervical radiculopathy. His next sentence, though, states, I think he should go ahead and move forward with subcranial decompression and a possible rotator cuff surgery, comma, if indicated. Keywords, if indicated. You're arguing credibility. Yes. Who determines credibility? Who determines credibility? Well, credibility is with, obviously, the arbitrator figures out. The commission. The commission, the arbitrator figures out right away. They test the credibility if the witnesses are being credible or not. Right. Is it ever for this Court to second-guess credibility? You know, putting aside qualifications and foundation for opinions, but just strictly witness credibility, is it ever proper? Can you repeat the beginning of your question? I'm sorry. Yes. Is it ever proper for the appellate court to second-guess credibility determination of the commission? In this case, I think so. With the manifest weight, what I'm getting to is what the records will show is that these records conflict what Dr. Cohn was truly diagnosing here. So with the manifest weight standard, I agree. Yes, they should. Getting back to the November 5, 2008 record, as I stated, cervical radiculopathy is what Dr. Cohn stated that he felt his symptoms were from. Secondly, he stated he should undergo subcranial decompression and a rotator cuff surgery if indicated. Now, if indicated, as I was stating, didn't know if he knew that there was a tear or not. He went on to state to the petitioner, your care after the surgery is going to depend on if I find a tear or not. Basically saying, if you have surgery and if we do the decompression, if there's not a tear, it's going to be two weeks. But if I have to fix the tear, I think it was going to be six or eight weeks. Now we look at the 2010 MRI. Same radiologist stated that there was a worsening since the 2008 MRI. The same radiologist at Illinois Bone & Joint stated there was a worsening. He found it, again, consistent with the tear. This time, Dr. Verma totally agreed, said that there was a small partial tear of the tendon. And this time, Dr. Cohn also was on board here, stating that there was a tear here. So at this time, based on the 2010 MRI, we have three sets of eyes all agreeing to the same thing. Three sets of eyes. I want to discuss petitioner's condition, if it resolved itself, basically after the initial accident. First, let's point out the petitioner did not undergo any care between November 5, 2008, through November 25, 2009, over a year, specifically for his right shoulder. He did undergo care with the chiropractor in early 2009, but he testified that this was not specifically for his right shoulder. It was for other body parts as well. There's two important medical records that we must look at in regards to his care, or his symptoms from his work accident, July 3, 2008, being resolved. The first one is October 27, 2009. Again, this is with his treating doctor, Dr. Cohn. He goes to see Dr. Cohn, and what do you think he complains of? Not right shoulder issues. Now he has a tailbone issue. There's nothing in the medical records. October 27, 2009, almost one year after, saying he had any issue with his right shoulder. Everything in the records was about his tailbone. No mention regarding his right shoulder. One month later, November 25, 2009, petitioner reported back to Dr. Cohn. This time, Dr. Cohn notes that petitioner had a reoccurrence, keyword, reoccurrence of right shoulder pain. He goes on to state that petitioner states his symptoms completely resolved until one month ago. Now let's take a step back. One month ago was when he was already in front of Dr. Cohn for his tailbone issue. And since then, within that month, now his symptoms have reoccurred according to what he said to Dr. Cohn. Completely resolved until one month ago. Of course, petitioner testified that he never told Dr. Cohn this. I've got to say, the records speak for themselves. The records speak for themselves. You mean the chiropractic records? I'm sorry? How about the chiropractic treatment for his shoulder from January until mid-April of 2009? Yes, it was in regards to he was receiving additional care, not only for his shoulder, but for other body parts. During that time, he was making mention that all he wants to do is golf, that he's been able to golf. He was having some issues with golf. But again, that care stopped. I don't know the exact date. I apologize. But in March or April of 2009, that care stopped. And again, that was not specifically for his shoulder. That was for other body parts. And he testified to that. Petitioner testified to that. Now we must ask, so what's the issue between 2008 MRI and the 2010 MRI? What happened? This was only addressed by one doctor, Dr. Verma, our IME doctor. He addressed this. What his opinion was, the rotator cuff degeneration that occurs as part of the aging process. This is part of the aging process. And he just didn't pull this opinion out of the air. He had facts to base it off of. Petitioner's right shoulder issues started back in 2004 that we know of. It's been a degeneration process since 2004. Petitioner's 57 years old at the time of the accident. And he's been a mechanic for 30 years. That's heavy labor that he's been doing. I think it's safe to say, looking around this room, that we kind of know what he's talking about, the whole aging process. I think we all can remember the day when we could roll out of bed and run five miles or play basketball or play tennis and not have any issues on the body. Looking at you and your case, it's probably a much shorter period of time that you're looking back. But what I'm getting at here is there's an obvious age degeneration. Let's also talk about what Petitioner was doing during that time. During that time, he had returned to work full duty. There was no medical records taking him off work full duty. With all due respect to counsel, I know he's going to state that, hey, it was testified that Petitioner needed a helper. My argument to that, that's ambiguous. When did he need a helper? Did he need a helper from day one after the work injury? We don't know this. Was it later on? We don't know what jobs he needed a helper for. Did other workers need helpers? We don't know this. I can safely say because of the aging process, which Dr. Verma stated here, again, the aging process, there's many times that I go back home, see my dad in Iowa, five years ago he could do something and now he can't. It's not because of a work accident. It's from the aging process. What did the other thing was Petitioner doing here? He was golfing. He was golfing a lot. Two times a week, 27 holes from March to October. He testified to this. This was in Chicago. He was golfing in the Chicago area and also he was golfing in Florida. He said his score was somewhere between 90 and 100 for 18 holes. Not a bad golfer. Now, just over a year, that's over 4,500 swings. 4,500 swings on the shoulder. I think it's safe to say the shoulders are heavily involved with golf. Knowing, being a big golfer myself, I know that the upper extremity injuries for golfers is the number two most common injury behind the back. So what I'm saying here is he was golfing throughout that time. So from his 2008 MRI to the 2010 MRI, golf definitely could have played a part in this. Did any doctor testify that the golf played a part? No doctor specifically testified that golf played a part. Dr. Verma noted it in his IMU report. I don't know if it's because he's not a golfer or if he hadn't done his research. He didn't specifically note golf, but he did note it in his records. He took notice of this, but again, he didn't note it. As I stated, Dr. Cohn never gave a causation opinion linking petitioner's condition to the work accident. In fact, as I stated, in the November 5, 2008 record, he wasn't even sure if his symptoms were related to cervical radiculopathy or a shoulder tear. He never gave a causation opinion. And remember back in 2008, he stated that he was going to have to have surgery to even see if there was a tear. He wasn't even sure if the 2008 MRI showed a tear. Another way we can look at this is is there a possible chain of events? If there's not a causation opinion, is there a chain of events that took place? Meaning was there good health? Was there a work accident? And was there a disability that showed improved causal connection? Here all there is is one of those elements. There's an accident. Is there good health? He had prior issues. We've already went over that. He had prior issues. There was an accident. I'm not arguing there wasn't an accident. Dr. Verma stated that he did suffer a sprain. And again, those resolved themselves. And then what about his disability? Again, he had a disability. As I say, with Dr. Verma with his disability, stating per the October 2009 and November 2009, though, his disability ended. It was not to this day present. Therefore, for everything that I've stated above, I kindly request this Court find that the Commission's decision was against the manifest way to the evidence. Thank you. Counsel, you may respond. Thank you, Your Honors. Good morning. John Rizzo on behalf of Mr. Bartolai. I had planned to tell you that I am deaf in this ear completely 100% in case I can't hear your questions. But it interestingly ties into what we're talking about here today. I was diagnosed with a tumor at the base of my skull in 2009. It took the eighth, ninth, tenth, and eleventh cranial nerves. I have difficulty swallowing. I can't hear. And I have one vocal cord. But most importantly, it took all of the muscles across the back of my shoulder right through here. I mention that only because I am also the two-time defending champion of the WCLA golf competition. As we sit here, I have won that competition five total times in the past two years in a row. But I can tell you unequivocally, despite my prowess as a golfer, my lack of shoulder muscles prevent me from lifting my arm to about here or about here. But I can hit a golf ball pretty darn well. Mr. Barlay's golfing activity is completely irrelevant, particularly if you want to take a 10-pound sledgehammer and compare that when you bang that against an automobile car frame and consider that to be something the equivalent of swinging a golf club made of titanium, purposely intended to be light. The reason why I mention this for about two, three minutes now is because that's the essence of their case. That's what they're relying on. They think because he could play golf, he could be an autobody mechanic. And the reality is there's just no comparison. So what are you saying? Is it the sledgehammer activity or is it the activity of other aspects of his job? Well, I think there's a lot of activity in this job that beat on this gentleman over the course of years. There's no question. Okay, because, you know, contrary to both of you, I've used sledgehammers and worked for heavy work people, and it's the torque of your body twisting that proper use of a sledgehammer. It's not that. Yeah, he did not hurt his shoulder swinging the sledgehammer. He hurt his shoulder when he was pulling the chains that are on these tower mechanisms that go in. They clamp the car, clamp to the tower mechanism, and then they pull the chain to pull the slack out. So it wasn't the sledgehammer. The sledgehammer is red herring. Which shoulder is it, anyway? What's that? Which shoulder? It's his right arm. His right arm. So, but just as importantly, what I would say is, is this the same argument that was before the commission? The commission heard this. Did he see a doctor in 2004 and say, my shoulder's bothering me? Yes. He was there one time. The doctor gave him a prescription for some anti-inflammatories, and he didn't follow up. There was no MRI. There was no injections. Same thing happened a second time. Shoulder's a little sore. Here's your prescription for Vioxx. Here's your prescription for Mobic. On your way. No injections, no MRI, and he continued to do heavy-duty work. Until this accident. Until this accident. And that's exactly what was before the commission. They viewed those facts. Counsel had an opportunity to bring in the owner. I'm sorry, they didn't bring in the owner. They brought in the chief executive officer who was there, who witnessed my client's testimony. And when my client said they provided me with a helper, he agreed. He wasn't able to do his job, and the commission picked up on that. Because the commission looked at this very carefully, right? They looked at this carefully because they modified the arbitrator's decision. They didn't just rub or stamp something that had occurred before. They took a very close look. They made their own specific findings. The decision and opinion from the commission is theirs. They wrote it. Not proposed decisions from either side, not the arbitrator. So they looked at all of these factors and made their factual conclusion. And they gave you four very specific findings that supported their conclusion. So if I look at those four very specific findings, then the analysis is, do those four specific findings have support within the record, right? That's what we should do. And if there's support within the record for those four specific findings, then the commission's decision should not be touched. What was the first finding? That he, prior to this, had worked full duty without restrictions, without treatment, without any problems. But after this, he had to work some light duty. He required the assistance of a helper that respondent themselves acknowledged. He required injections into his shoulder to quell the pain and limitations in order to keep doing the vast majority of his job. Otherwise, in 2008, he would have underwent surgery. But he didn't, because he wanted to keep working. Now, wasn't that something that's great to see? Could he have just gone home and said, I'm ready for surgery. I'll sit on the couch until you all approve it and send me my checks. No. He wanted to keep working. And he did, but he required assistance. And respondent's witness acknowledged such. And the commission made that one of their findings. Is that supported in the record? It is. There's no evidence that he had to restrict his work before this accident. There is evidence he restricted after this work, this injury. And it's acknowledged by the respondent themselves. Where's the contrary evidence to that? There isn't. That's the truth. That's a fact. And the commission found that. So number one is supported. There's nothing contrary to that. Number two is a finding by the commission where they compared the two MRIs. And they said the two MRIs are consistent with the petitioner's testimony. Let's take a look and see whether or not that statement, that finding by the commission is supported by the record. And the answer is we can look to the petitioner's testimony first. And clearly he says, I got my injection. I worked for a number of months. It creeped back. I got another injection. It creeped back six or seven months later. I got another injection. But each time he wanted to keep working, but each time he got an injection, the time that the injection helped him decreased. Twelve months, seven months, four months. So was his conditioning worsening? Yep. Did the MRIs confirm that? You bet. Look at respondent's witness testimony, as I've outlined in my brief. They had the CEO come in, and he says, the petitioner was telling us about his treatment all along. He talked about shots and whatnot, was the quote. When they, the respondent's general manager, called workers' camp, they told workers' camp, this has been ongoing. This has been going on. It's not getting better. Mr. Barnilai has been complaining about it. That's their testimony. When he reported, when the general manager reported it, called workers' camp and said, my guy's in the office. He needs to go back to the doctor. Can you approve it? They asked him what was going on. And he filled out another report and said, this is from July of 2008. He said, and then he testified that it was going on over and over and over. And he confirmed the report between Mr. Barnilai and the owner of the dealership, where they were conversing about how this was continuing. So the answer is, is number two supported by the evidence? Is number two supported by facts that the commission found there? And the answer is, it is. And most of that is supported by their own witness. Were there changes in the MRI? Yes, there were. Now, you would say, well, Dr. Verma doesn't think so. Well, that's fine. He's entitled to his opinion, right? But isn't Dr. Cohen entitled to his opinion? And how about Dr. Bernfield, the radiology specialist who read it and said there was a tear? He's entitled to his opinion. So when the commission relied upon Dr. Cohen stating that there was tears in the MRI, and Dr. Bernfield, the radiologist, saying there were tears in the MRI, can't they rely on those? And they did. So their finding that there was tears in the MRI, saying that Dr. Verma was not persuasive, is supported by evidence in the record. Two doctors opined that. So it's not contrary to the manifest weight. It's supported by the evidence. They made a third conclusion, and they said that he was told he needed the same surgery on November 5 of 2008 and the same surgery on January 18, 2011. So take a look at that. And is that true? Is that supported by the record? Because if it is, we have to leave it alone. And the answer is exactly the same. Now, counsel just told you that when Dr. Cohen suggested a surgery in 2008, he said, oh, we're going to do an exploration. No, he didn't. He specifically said, we're doing an arthroscopic surgery with a subchromial decompression and possible rotator cuff repair. Well, why is it a possible repair? Well, because sometimes partial tears are just debrided. They don't need to be sewn back up. Sewing a complete tear is a repair. Debriding a frayed cuff might not need repair. But the answer is not about what the surgery was. The answer is it was the same surgery in November of 2008 as the surgery in January of 2011. Same surgery. That's what the commission found. That's one of the elements they used to support their findings. Is there truth to that? Absolutely. That's what's in the record. That's what Dr. Cohen wrote on those two days. So to say whether or not the commission is against the manifest, wait, look at number three. Is it supported? Yes, it's supported by the record. And it's not anything that's undermined by the fact that he had seen a doctor in 2004. Well, no one recommended surgery in 2004. Nobody recommended injections in 2004. Nobody even recommended physical therapy in 2004. The same thing was true in 2005. Those things only occurred contemporaneous with this injury. And the commission found that fact important. That was in their decision. That's supported by the record. The last one was number four that the commission said that Dr. Verma was unpersuasive. And I already touched on this under number three because it kind of came in with that. But the commission said our fourth point is that Dr. Verma's opinion was unpersuasive. Again, why? Well, the commission has to make that determination, right? Isn't that their job? They say Dr. Cohen said there's a tear. Dr. Bernfield, the radiologist who reads films all the time every day, says there's a tear. Dr. Verma says there's no tear. Somebody has to resolve that, right? Well, under our case law, the resolution of that conflict belongs across the street. And they made it. And once they make it, do they have a basis for making it? And the answer is Dr. Cohen said, Dr. Bernfield said, yes, there was. That's the basis for their opinion. What is contrary manifestly by Dr. Verma having a contrary opinion? It's not. It's not manifestly. It's a contrary opinion but hardly carries the weight. And I won't say there's two doctors against one because every time I say there's two doctors against one, the carrier will go hire four more doctors. That's easy. But that's not really the point. The point is that was one of the commission's findings of fact and resolution of a conflict in the record. They made a determination. They gave you a finding as to why they came to that conclusion. And I'm here standing before you to say there was a basis for it in the record. Your time is up. I ask that you affirm the commission's decision, Your Honors. Thank you. Counsel, you may reply. Other than if I just might, Hoffman, Hudson, Haldridge, Harris, Stewart, where's the H? Pardon? You don't have an H. Oh, yeah. Honorable. I understand that. And neither does anybody else in the Fifth District. So, you know. Just one of those things. There was a club and you were like. If I could just take a couple minutes. I appreciate it. Yes. Do you have time? Yeah. I appreciate it. Thank you. He started out his argument talking about his personal golf with the Wicklow Golf Tournament and his championships that he's won. Just to clarify, that is a four-man team event. So, he did not win these individually. With all due respect. We won't be making any findings on any of that either way. Initially, he was talking to us. There's always a ringer. There's always a ringer. You're right. Initially, he was talking about respondent basing a lot of their argument on golf. That was a very small part of our argument. Based a lot of our argument off Dr. Verma. Again, there's a degeneration of the rotator cuff. An aging process here. And his IME supports that. As I stated before, Dr. Cohen initially said, yeah, it's a rotator cuff tear. There's a tear there. But again, his actions speak louder. If he thought there was a tear, why a month later would he have said, you know what, I think your symptoms are from cervical radiculopathy. Why didn't he address the tear right then? Why did he bring up cervical radiculopathy? The MRI from 2008 to 2010, the same radiologist said it was worsening. It was much worse. We've got to remember the petitioner was working full duty throughout that whole time. Of course, it's going to get worse. We've also got to remember in October of 2009, 14, 15 months after the original accident, what did the petitioner say? He went to the doctor for a tailbone. The same doctor is treating a doctor for a shoulder for a tailbone injury. No mention was made of any shoulder complaints. One month later, the key here, I think this is the key medical record, November 25, 2009, specifically states petitioner had a reoccurrence of a right shoulder pain. Petitioner states that his symptoms completely resolved until one month ago. His symptoms completely resolved until one month ago. I'm going to leave you with that thought. I appreciate your time. Thank you, Counsel Ball, for your arguments on this matter. It will be taken under advisement and a written disposition shall issue.